# UNITED STATES
# COURT OF FEDERAL CLAIMS

**FILED**

FEB 2 4 2003

U.S. COURT OF
FEDERAL CLAIMS

NEW BREED LEASING CORP.,     )
                          )
             Plaintiff,    )
                          )
v.                          )   Docket No.:   03-115C
                          )
UNITED STATES,             )
                          )
             Defendant.    )

Pages:     1 through 48

Place:     Washington, D.C.

Date:      January 29, 2003

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

ORIGINAL

46

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NEW BREED LEASING CORP.,      )
                              )
            Plaintiff,        )
                              )
v.                            )   Docket No.:  03-115C
                              )
UNITED STATES,                )
                              )
            Defendant.        )

                         Courtroom 8
                         National Courts Building
                         717 Madison Place, N.W.
                         Washington, D.C.

                         Wednesday,
                         January 29, 2003

        The parties met, pursuant to notice of the

Court, at 2:02 p.m.

            BEFORE:  HONORABLE LAWRENCE BASKIR
                     Judge

            APPEARANCES:

            For the Plaintiff:

            PHILLIP J. DAVIS, Esquire
            PHIL HARRINGTON, Esquire
            TIM STALEY, Esquire
            DAN GRAHAM, Esquire
            Wiley, Rein & Fielding
            1776 K Street, N.W.
            Washington, D.C.  20006
            (202) 719-7044

            For the Defendant:

            JOHN H. WILLIAMSON, Esquire
            U.S. Department of Justice
            1100 L Street, N.W.
            Washington, D.C.  20530
            (202) 616-0340

APPEARANCES:     (cont'd.)

<u>Also for the Defendant</u>:

LAURIE DYM, Esquire
U.S. Postal Service


<u>For the Intervenor, APL Logistics, Ltd.</u>:

MICHAEL GORDON, Esquire
DONALD HOLMES, Esquire
Holmes, Shwartz & Gordon
17 West Jefferson Street, Suite 202
Rockville, Maryland  20850
(301) 340-1251

1    <u>P R O C E E D I N G S</u>

2                                    (2:02 p.m.)

3          THE CLERK:  All rise.  The United States

4    Court of Federal Claims is now in session, the

5    Honorable Judge Lawrence Baskir presiding.

6          New Breed Leasing Corporation v. United

7    States, Case No. 03-115C, comes before the Court today

8    on the Plaintiff's motion for preliminary injunction.

9          THE COURT:  Good afternoon, everybody.

10   Please be seated.

11         ALL:  Good afternoon, Your Honor.

12         THE COURT:  Can we start by having counsel

13   identify themselves, please?

14         MR. DAVIS:  Yes, Your Honor.  My name is

15   Phillip Davis.  I'm with Wiley, Rein & Fielding.  I'm

16   counsel of record in this matter.

17         If the Court please, I would like to

18   introduce counsel at counsel table.  This is Phil

19   Harrington of our office, Tim Staley of our office,

20   and Dan Graham of our office, Your Honor.

21         There's one more person.  Mr. Dennis Hunt is

22   in the seats back there.  He is a corporate official

23   of New Breed.

24         THE COURT:  Okay.  Thank you.

25         MR. DAVIS:  Thank you, Your Honor.

1          MR. WILLIAMSON:  Your Honor, John Williamson
2     representing the United States from the Department of
3     Justice.  With me also at counsel's table is Laurie
4     Dym, chief counsel for Commercial Litigation at the
5     United States Postal Service.

6          Also seated in the back of the courtroom is
7     Mr. Keith Strange, who is a vice president with the
8     U.S. Postal Service.

9          MR. GORDON:  I am Michael Gordon for APL
10    Logistics, and I'm here with my partner, Donald
11    Holmes.

12         THE COURT:  Very good.  Thank you.  I have a
13    couple of preliminary matters.

14         First, Mr. Gordon, as you probably noticed
15    after you dropped your paper in the box that you
16    forgot to put a title to the paper.  The front cover
17    does not identify the nature of the document it
18    covers.  Maybe you didn't notice.  Take a look at it
19    if you will and just make up a nice title and file a
20    new cover page.

21         We now know what it refers to, but as this
22    thing goes on and on and on there might be lots of
23    filings.  We will pick this thing up and say I wonder
24    what this is about.

25         MR. GORDON:  I did notice that, and I

1    thought we had put a title page --

2           THE COURT:  Not on at least the one that I
3    have.

4           Second matter, I think you all have been
5    pretty diligent in filing redacted public copies, but
6    I'm not sure that everybody has been filing
7    highlighted sealed copies.  I think maybe, Mr. Davis,
8    you all may have, but I think the government has not.
9    At any rate, it's important that we know it because we
10   can't tell just from a redacted copy what used to be
11   there, and I think it's important to have it.

12          It's certainly important for the future
13   record, so if you all could file a set, and I think
14   probably it's best to file a complete set of the
15   filings you've already made with the protected
16   materials, the phrases, highlighted.

17          MR. WILLIAMSON:  Yes, Your Honor.

18          THE COURT:  It's essentially a logistical
19   job.  It shouldn't take very long.  Maybe we can have
20   that by Monday.

21          MR. WILLIAMSON:  Yes, Your Honor.

22          THE COURT:  Do you think that would be all
23   right?

24          MR. WILLIAMSON:  Yes, of course.

25          THE COURT:  I don't want to press you all to

1    run the xerox machine over the weekend, but I think

2    Monday is probably time enough.

3              MR. WILLIAMSON:  I think we can get out our

4    highlighters before Monday, Your Honor.

5              THE COURT:  And then obviously when you file

6    subsequent papers, you not only have to highlight your

7    own protected material, but the other side's.

8              By that time I think it will be pretty

9    obvious what each side is claiming, but if there's any

10   doubt about it by all means send an advance copy to

11   the other side --

12             MR. WILLIAMSON:  Yes, Your Honor.

13             THE COURT:  -- so that they can add

14   highlighted versions.

15             We do have a slight difficulty because we're

16   going to now talk about some things, and we may indeed

17   make references to protected material.  We have an

18   audience, and I'm not sure who's in the audience.  I'm

19   not sure who's been admitted to the Protective Order

20   or not.

21             I think for the first subject or two

22   probably there is no -- never having seen a

23   highlighted copy, I'm totally in the dark as to what

24   you all consider to be protected and not protected,

25   but it seems to me for the first few minutes, at any

1    rate, so far as I can see, there's no need to close

2    the courtroom, and I don't want to close the

3    courtroom.

4            I think maybe for most of what we're talking

5    about there may in fact not be a need to refer

6    explicitly to protected material.  I don't know.  I

7    know what the prices were, so all you have to do is

8    say APL's price, New Breed's price.  You don't have to

9    be explicit about that if that's protected

10   information.  Most of the other stuff I'll know by a

11   reference.

12            Let me ask Mr. Davis first.  What about this

13   hearing and protected information?

14            MR. DAVIS:  Your Honor, you're exactly right

15   in everything you've said.  I don't know everybody in

16   the audience either except Mr. Hunt from New Breed.

17   I've informed him that we may well be addressing

18   protected material during the course of this argument,

19   and he well understands that he might have to leave

20   the room --

21            THE COURT:  Okay.

22            MR. DAVIS:  -- for part of the proceedings.

23            I would tell Your Honor that again I think

24   you're right; that there's going to be a substantial

25   part of this argument where probably protected

1    material is not invoked, but I know from looking at my

2    notes that I will be referring to some protected

3    information or information that I would expect the

4    Postal Service to seem source selection sensitive

5    information, Your Honor.

6         THE COURT:  Is that the memorandum, the

7    decision memorandum, the award memorandum?  Is that

8    protected?

9         MR. WILLIAMSON:  Yes, Your Honor.  I'm

10   sorry.

11        MR. DAVIS:  That is what I was referring to,

12   Your Honor, and I think there are two other

13   submissions as well.

14        I'll try to be sensitive that when I get to

15   that point I'll try to stop and alert people, and

16   certainly I'd call on counsel to help me in that

17   regard if I seem to be going down a path of protected

18   information with people in the room that shouldn't

19   hear that information.

20        THE COURT:  Okay.  Mr. Gordon and Mr.

21   Williamson, is it sufficient to leave it to counsel to

22   wave a hand or something else?

23        MR. WILLIAMSON:  Yes, Your Honor.

24        MR. GORDON:  As long as they're looking at

25   us.

1          THE COURT: Well, we don't have a red flag,
2    do we? Maybe we should get a red flag.
3          Let me also say, by the way, I know
4    attorneys feel uncomfortable addressing the Court
5    without standing, but we're recording this through the
6    microphones, and to the extent that you are polite to
7    that extent it may not be picked up by the
8    microphones, so it's perfectly okay with me --
9          MR. WILLIAMSON: Thank you, Your Honor.
10          THE COURT: -- for you to respond by
11    sitting. For brief exchanges I don't think it's
12    necessary to come to the podium, but if you'd like to
13    come to the podium, of course, then it automatically
14    gets recorded.
15          MR. WILLIAMSON: Thank you, Your Honor.
16          THE COURT: Okay. I think those are all the
17    preliminary matters that I have, so let me ask Mr.
18    Davis. Are there any preliminary matters that you
19    have before we start addressing the question of the
20    injunction?
21          MR. DAVIS: Your Honor, I don't believe so.
22    Thank you.
23          THE COURT: Mr. Williamson?
24          MR. WILLIAMSON: No, Your Honor.
25          THE COURT: Mr. Gordon?

1           MR. GORDON:  No, Your Honor.

2           THE COURT:  Okay.  I have one other

3   preliminary matter, and that has to do with my

4   disappointment that you all have not been able to work

5   out some sort of a voluntary alternative to this

6   injunction proceeding.

7           I hope that I was misled by a reference I

8   think in New Breed's reply that you were negotiating a

9   compromise injunction.  I certainly hope you were not

10  negotiating a compromise injunction, but negotiating a

11  compromise alternative to an injunction, and I am

12  disappointed that you could not do that.

13          It does strike me that there is a community

14  of interest on the part of all three parties to

15  address some of the issues that underlie New Breed's

16  concern because to some extent they ought to be shared

17  by the other two parties or shared in another way.

18          It seems to me that, for example, the Postal

19  Service is not served by work force instability over

20  the course of the next few months.  It seems to me

21  that APL would be served by having some assurance that

22  to the extent they are interested in hiring New Breed

23  employees they have some assurance that they'll be

24  able to do that.

25          It seems to me there's a sufficient

1    community of interest to work out an agreement,

2    especially since it seems to me uncertainty is the

3    thing that is the most pressing for not only the three

4    parties here, but the fourth unrepresented party,

5    which is to say the work force itself.

6        Not being privy to your discussions or

7    anything else, I could see some sort of an arrangement

8    where, for example, you were explicit, and when I say

9    you I mean APL and the Postal Service, at the kind of

10   transition activities that you wanted to get New Breed

11   to participate in and the timing of it and to see

12   whether you can't let this slip a little bit or that

13   slip a little bit or schedule this in a different

14   circumstance instead of having what comes to mind is

15   APL with banners outside the facilities saying Repent.

16   The time is near.  Join APL.  You could do something

17   less flagrant than that or whatever the equivalent

18   might be.

19       I'm really disappointed that we have to now

20   come down to what inevitably is going to be a

21   blunderbuss decision by the Court in either granting

22   or not granting it.  I'm frankly at a loss to see why

23   you all couldn't do that.

24       MR. DAVIS:  Your Honor, if I may?  As we

25   explained in our reply memorandum filed last night and

1    as I had intended to discuss this afternoon, we have

2    had discussions, as you know, and New Breed for its

3    part thinks that it went very far down the road.

4            THE COURT:  Excuse me for interrupting

5    you --

6            MR. DAVIS:  Sure, Your Honor.

7            THE COURT:  -- but I've just been sabotaged

8    by the chair, which started off being too high and now

9    almost went too low, but I think we're all right.

10           Okay.  I'm sorry.

11           MR. DAVIS:  Sorry, Your Honor.

12           THE COURT:  I was distracted by the chair.

13           MR. DAVIS:  No problem.  It's New Breed's

14   view that we went very far down the road in terms of

15   accommodating the Postal Service and APL in what we

16   understand and what we appreciate are certain

17   necessary activities that both those parties need to

18   engage in in order to get an MTESC up and operating.

19           After all, it was New Breed that was, you

20   know, in close partnership I'll say, if you will, Your

21   Honor, with the Postal Service in getting the MTESC

22   program up and operating in the beginning.  New Breed

23   is thus very, very sensitive to the activities that

24   need to be undertaken both by the Postal Service and

25   by a new MTESC contractor in order to get a facility

1  up and operating.

2          We made a proposal that we thought would

3  have allowed APL and the Postal Service to undertake

4  the activities that they believed in their discretion

5  they needed to undertake in order to get the facility

6  up and operating.

7          There was a four-part proposal that we made

8  that they could undertake those necessary activities,

9  and we pointed out explicitly that APL could proceed

10  with its lease, that the Postal Service could proceed

11  with reviewing drawings, approving drawings, facility

12  drawings, equipment layout, site plans, parking space

13  plans;

14          That APL could proceed with seeking and

15  submitting to the government authorities, whose

16  approval it apparently needs in order to make site

17  modifications to its proposed facility.  We also went

18  so far as to say APL could start construction on its

19  plant if it would like to do that, if the parties

20  thought that that was appropriate.

21          Second of all, Your Honor, what we wanted in

22  return was in the interest of no destabilization of

23  our work force so that we would keep our work force

24  and keep productivity and keep performance ongoing for

25  the Postal Service under our exiting MTESC contract

1    that we would appreciate that the Postal Service not

2    undertake activities that would disrupt our employee

3    work force such as coming into the plant in New

4    Jersey, requesting to make arrangements and discuss

5    the transition to APL, and they've already asked to

6    make those types of visits.

7         Transition is not necessary at this point,

8    Your Honor.  There is a contractual provision in our

9    existing contract, which Mr. Hunt addresses in his

10   affidavit submitted as Exhibit P in the reply

11   memorandum.

12        There is a transition plan that is

13   contractually mandated, and that's been approved by

14   the Postal Service, which says the transition

15   activities will indeed start, but they won't really

16   get going until about 30 days before the end of the

17   contract, so there's no need now --

18        THE COURT:  Excuse me.  Excuse me for

19   interrupting.  I did notice the reference by Mr. Hunt

20   to a Transition Plan --

21        MR. DAVIS:  Yes, Your Honor.

22        THE COURT:  -- initial caps, paragraphs

23   indicated, but I didn't see a copy of such a plan.

24   Did you file such a plan?

25        MR. DAVIS:  Your Honor, we did not attach it

1    to the affidavit, thinking that Mr. Hunt's explanation

2    in his affidavit was appropriate. If Your Honor would

3    like it, we could certainly supply it to the Court.

4            THE COURT: There are a number of things

5    that aren't in the record thus far, and we'll get to

6    them I suppose, but that's certainly one of them. You

7    haven't finished.

8            MR. DAVIS: No.

9            THE COURT: I think what you're doing, and I

10    think it's important for these purposes, is you're

11    elaborating on the summary on page 3 of your paper --

12           MR. DAVIS: Yes, Your Honor.

13          THE COURT: -- which looks to be either your

14    revised request, as well as one of your negotiated

15    proposals. Is that correct?

16           MR. DAVIS: Yes, Your Honor.

17          THE COURT: Okay.

18           MR. DAVIS: I mean, that was our offer to --

19          THE COURT: I want to make that explicit, so

20    why don't you continue with that? Then I will address

21    the other two parties.

22           MR. DAVIS: Sure, Your Honor. I'd be happy

23    to do that.

24           THE COURT: I gather that from this it's

25    fairly explicit, I think. It appears to me that

1      paragraph 1 says whatever transition plans APL and the

2      Postal Service feel necessary to do, that's their

3      business.

4            MR. DAVIS: Yes.

5            THE COURT: Number two has to do with New

6      Breed's participation in transition plans.

7            MR. DAVIS: That's correct, Your Honor, with

8      one caveat, if I may.

9            THE COURT: Yes.

10           MR. DAVIS: We would prefer that those

11      activities of Postal in particular not be visible, if

12      you will, or impact our employees directly, such as

13      coming into the facility --

14           THE COURT: Right.

15           MR. DAVIS: -- and wanting to sit down and

16      meet with us regarding transition, wanting to

17      negotiate and discuss and prepare a transition plan or

18      wanting -- another example, Your Honor, which I

19      believe we say in the brief, but I'll certainly recite

20      it here, and Mr. Hunt does in his affidavit. You

21      know, the Postal Service negotiating new or modified

22      truck/trailer or motor carrier contracts for those

23      motor carrier companies that come and deliver MTE

24      right to our docks, to our facilities.

25           The word that those negotiations are ongoing

1    will certainly get to the truck drivers and in turn
2    will get to our employees who interact with the truck
3    drivers on a regular, day-to-day basis.  There are 100
4    truck deliveries in and out on a daily basis at the
5    New Jersey MTESC, so we would like the Postal Service
6    to stand down on those negotiations.

7         Mr. Hunt has submitted an affidavit
8    explaining that he's had significant experience
9    negotiating those types of contracts, and they can be
10   done in a matter of weeks, not six months before the
11   contracts need to be switched over to another delivery
12   point.

13        Lastly, Your Honor, if I may, or thirdly, we
14   would request that APL not come and try to hire away
15   our employees.  As you say, put the banner, The End Is
16   Near banner, outside our facility and say come to APL.
17   We would prefer them not to come and affirmatively
18   seek to hire away our employees.  That can only have a
19   further disruptive impact on our employees.

20        Lastly, Your Honor, I would say that if
21   because of this, that agreed compromise, that
22   compromise, Your Honor, it became necessary or APL was
23   unable as of June 20, the date that New Breed's
24   contract ends, if they were unable by that date to
25   have an up and operating MTESC facility themselves,

1        assuming they went forward, that New Breed would be
2        willing to agree to extend its existing contract
3        beyond the June 20 end date.

4                They would do so not at the current prices
5        of the contract, but at the different prices that were
6        set forth in its December 30, 2002, proposal to the
7        Postal Service here so that there would be no
8        interruption, no disruption of MTESC's services to the
9        Postal Service or in fact to the nation as a whole,
10       Your Honor.

11               THE COURT:  Okay.

12               MR. DAVIS:  I'm at a loss, Your Honor.
13       Excuse me.  I'm at a loss as I sit here today before
14       you as to the reasons why that proposal, that
15       suggestion, was rejected by Postal and by APL.

16               It seems to me it goes very far down the
17       road, if not all the way down the road, to giving
18       Postal and APL virtually carte blanche to do just
19       about anything they believe they need to do in their
20       discretion to go forward with the implementation or
21       the award and implementation of performance of this
22       contract, but at the same time protecting New Breed's
23       I think well recognized interest in not having a
24       destabilized work force and, thus, a drop off in
25       productivity, a drop off in performance.

1          The reason that a drop off in productivity

2     is important, Your Honor, is because under our

3     existing contract there are certain revenue guarantees

4     that the Postal Service gives to us, but we have to

5     meet certain productivity requirements.

6          THE COURT:  I think it's very useful for you

7     to put on the record in a narrative form what is on

8     page 3 of your brief at least as a starting point for

9     the discussions I want to have now, as well as the

10    more formal proceeding that will follow or may follow.

11    It's important to know exactly what it is you're

12    proposing now, as opposed to what you originally had

13    proposed.

14         MR. DAVIS:  And we are willing to go forward

15    on that basis as we sit here today, Your Honor.

16         MR. WILLIAMSON:  Your Honor?

17         THE COURT:  Let me say, Mr. Williamson, I

18    know you can't resist putting on the record the good

19    faith, earnest effort you all made as well towards

20    reaching an agreement.

21         I'm prepared to take judicial notice of that

22    fact, but if you feel you must actually articulate it,

23    you certainly may.  Then I want to start talking about

24    something more concrete than that.

25         MR. GORDON:  Thank you.

1          THE COURT:  I think Mr. Williamson has first

2     crack.

3          MR. WILLIAMSON:  All right.

4          THE COURT:  I'm sorry, Mr. Gordon.  You are

5     an intervenor, but just an intervenor.

6          MR. GORDON:  I thought I'd be much, much

7     briefer.

8          THE COURT:  Than Mr. Williamson?  I don't

9     know either of you, so I'm not going to make a

10    decision based upon that yet.

11         MR. GORDON:  It was the substance that would

12    be briefer, I think.

13         The reason I wanted to mention the

14    armageddon that I spoke of before is I think if the

15    injunction had been issued on Friday everything that

16    was said would have been true, but at this point with

17    the offer that's been made by APL the harm to us of

18    not being able to enter into a lease and go forward is

19    almost completely gone.

20         THE COURT:  Right.

21         MR. GORDON:  The particular offer that's

22    being presented in the papers is slightly different

23    than the one that was discussed because there was a

24    sense that we might not be able to hire anyone from

25    APL, as well as potentially solicit them.  I thought

1    that would be discriminatory, and I couldn't agree
2    with that.

3         However, I would say this.  I don't see why
4    we should be stopped from putting an ad in the paper,
5    for example, and if people come to us and ask us to
6    work why we couldn't interview.  That's the only harm
7    I see to us that's still --

8         THE COURT:  And that's with respect to
9    paragraph 3?

10        MR. GORDON:  Yes.  I mean, the words I'm
11   sure try to say what he meant when he said employment
12   initiatives.

13        THE COURT:  We'll pursue the meaning of that
14   phrase, but I think without getting down to strict --

15        MR. GORDON:  It's not that important to us
16   is what I'm saying.

17        THE COURT:  Okay.  It's not that important,
18   and I think there may be ways to accomplish that that
19   satisfies not only the three parties here, but the
20   unrepresented fourth party, which is to say the labor
21   force.

22        THE COURT:  Mr. Williamson?

23        MR. WILLIAMSON:  Yes, Your Honor.  I'll
24   start with the labor force because I think that the
25   proposal that New Breed has made does not really

1    address their stated concerns, which are the departure
2    of their work force.

3           If an injunction were entered along the
4    lines, or if we struck an agreement, Your Honor.  I
5    would not presume that the parties could agree upon an
6    injunction, but if we were to enter into an agreement
7    along the lines that Mr. Davis had proposed, his
8    initial proposal was not simply that we not put up a
9    banner or allow APL to advertise and actively and
10   affirmatively solicit New Breed's employees, but it
11   would be that APL was completely barred from hiring or
12   communicating in any fashion with New Breed's
13   employees.

14          I think that that actually would be the most
15   disruptive thing because that promotes uncertainty in
16   the New Breed work force.  The thing that would
17   promote the most certainty for them, Your Honor, is if
18   they were free to, as they are already doing, continue
19   to send their resumes to APL.

20          There is no requirement or there's no need
21   for APL to actively solicit from these people.  By New
22   Breed's own admission in their affidavits, their
23   people are already starting to solicit employment with
24   APL, and I think if New Breed's true concern was
25   preserving their work force over the next few months

1    and, therefore, continuing to do the best possible job

2    for the Postal Service, then the logical thing would

3    be that if employees knew that they could remain with

4    New Breed if New Breed prevails in the bid protest,

5    but if they have the opportunity to speak to APL and

6    get a conditional offer from APL, dependent on what

7    happens with the bid protest, then the employees will

8    know either way they're covered so long as New Breed

9    would not take any sort of action against them for

10    maintaining a conditional offer like that.

11    That way the ones at least who are prepared

12    to go the 35 miles to this new facility would know if

13    New Breed wins we stay with New Breed. If APL wins,

14    then we could go work for them. There would be many

15    fewer departures, in fact, than if an injunction were

16    entered requiring the government and APL to stop

17    performing at all or if we were to enter into an

18    agreement along the lines that have been proposed by

19    Mr. Davis.

20    THE COURT: Mr. Williamson, what you say is

21    really what led me to wonder why you all couldn't come

22    to an agreement.

23    It appears to me that whatever employment

24    insecurity was caused by the award, employment

25    insecurity in New Breed's work force, it at least had

1    a virtue, and that is as of June 20 they would be out
2    of that job, but they had an opportunity to see if APL
3    would hire them, so in terms of as the work force is
4    concerned at least they knew what their choices were.

5           With the protest, their situation is as a
6    practical matter much more confused and uncertain
7    because they don't know which ship to go with.  They
8    could choose wrong.  They could stay with New Breed
9    and be shut out of APL when that became clear.  They
10   could go with APL and be shut out if it turns out that
11   either this matter is not resolved for months or it's
12   resolved in favor of New Breed.

13          MR. WILLIAMSON:  But, Your Honor, there's no
14   need for them to make a choice right now because the
15   time to begin performing the contract is three and a
16   half months --

17          THE COURT:  I understand that, but there are
18   two things that you must I think acknowledge.  First
19   of all, there's an uncertainty on the part of the
20   employees as to where they should go, and there's
21   uncertainty on the part of New Breed as to who will
22   stay and who will go.

23          It seemed to me that from what you said you
24   very clearly had the workings of an agreement.  I
25   don't know to what extent APL would like to hire these

1    people, but it seems to me that if the parties came to

2    the work force and said we understand your situation,

3    and this is what we've agreed to do; if you stay with

4    New Breed through this period of time New Breed will

5    recommend and APL will think very seriously or indeed

6    will conditionally hire Ms. Mahoney, Mr. Ferraro and

7    the other people.

8         Right now they don't have any assurances as

9    to where they go, and it just seemed to me as I looked

10   at the situation here, not an unusual situation, that

11   it was to everybody's advantage, especially maybe the

12   Postal Service, as well as the employees, to put some

13   sort of order into this uncertainty, put some sort of

14   certainty into this uncertainty.

15        Certainly Mr. Ferraro and Ms. Mahoney and

16   all the others would feel a whole lot better about

17   working with New Breed if they knew that staying with

18   New Breed until May or June, whatever the date is that

19   you've agreed upon, or mid April, would not jeopardize

20   their carry on employment with APL and that they would

21   have a job one place or the other no matter how this

22   litigation turned out.

23        So I don't really understand why you

24   couldn't come to and still can't come to an agreement

25   that not only puts certainty into the situation of the

1    work force, but certainty into your own work force

2    over this delicate period.

3            MR. WILLIAMSON:  The other issue --

4            THE COURT:  I want to move also to paragraph

5    2.  I don't know what the plans are, but we are in

6    fact as a practical matter talking about two months.

7    The briefing is supposed to be finished by March 7.  I

8    cannot imagine a circumstance in which we would go

9    beyond April 1.  I'm probably a whole lot closer, so

10   that's essentially two months.

11           I don't know what kinds of transition plans

12   the Postal Service and APL have in mind that would

13   fall within paragraph 2.  I don't know what the timing

14   is, and I don't know what arrangements couldn't be

15   made to minimize what appears to be essentially a

16   psychological impact, if not a practical impact, on

17   the work force, but it seems to me you could work it

18   out.  I just don't understand what you can't work out.

19           MR. WILLIAMSON:  Your Honor, I --

20           THE COURT:  Mr. Davis says very little is

21   scheduled in the first two months, but I don't know

22   because neither the government nor APL nor New Breed

23   favored the Court with the schedule of transition

24   activities that might or might not be covered by

25   paragraph 2.

1          MR. DAVIS: I think you're right, Your

2    Honor. By the way, Your Honor, I appreciate your

3    guidance on this and your involvement in helping the

4    parties reach an agreement if that's your desire. I

5    welcome it and New Breed does.

6          Our view is that nothing needs to occur now.

7    Nothing really needs to occur until the anticipated

8    April 1 date of the decision on this matter on the

9    merits, Your Honor.

10         THE COURT: I understand that your position

11    is that nothing needs to, but it would certainly help

12    me before I made that determination to know what was

13    planned, what kinds of participation the Postal

14    Service and APL think they need over the course of the

15    succeeding two months that either intrudes upon New

16    Breed's activities, which is one thing, or has an

17    aggravated psychological impact on the work force, a

18    much less tangible kind of concern.

19         I don't know what you have in mind. I don't

20    know that you couldn't do it another way. Couldn't it

21    flip a week or two weeks, whatever the schedule is?

22         MR. DAVIS: And New Breed doesn't know as

23    well. We're concerned with the reaction that we've

24    already had from our employees.

25         THE COURT: I, frankly, would hate to go

1  through a formal hearing or formal decision making

2  process with respect to paragraph 2 to find out there

3  was no reality behind it.

4       MR. WILLIAMSON:  Your Honor, I am probably

5  not best qualified to give you the week by week

6  schedule, but, as I understand it from consultations

7  with the Postal Service, there are activities,

8  transition plans, that they would like to embark upon

9  before --

10       THE COURT:  Covered by paragraph 2?

11       MR. WILLIAMSON:  Yes, Your Honor.  I think

12  the principal difficulty or the principal concern that

13  we had, Your Honor, is that we did not want to spend

14  the next two months or six weeks devoting the parties'

15  and the Court's resources to trying to police an

16  agreement when the Postal Service employees are at New

17  Breed's facility daily.

18       If the Postal Service is required not to

19  talk about certain activities and not engage in

20  certain activities, we think that could be a very

21  difficult --

22       THE COURT:  So you've answered one question

23  that was not answered in the papers.  My question was

24  how often are Postal employees there.

25       I suspected Postal employees, officials,

1    were there quite regularly, if not daily. Now you're

2    telling me daily, right?

3            MR. WILLIAMSON: That's my understanding.

4            THE COURT: So the real question is what do

5    they say behind closed doors and to whom.

6            MR. WILLIAMSON: Yes, Your Honor, but there

7    are Postal employees on site on a regular basis. They

8    are there for operational purposes.

9            THE COURT: I understand that.

10          MR. WILLIAMSON: They are there for quality

11    control, productivity monitoring, et cetera. They are

12    not there -- well, I am speaking a little bit beyond

13    my pay grade here too as well, Your Honor, because I

14    would represent to the Court that I would doubt that

15    the people that are there on a regular daily basis to

16    make sure the contract is performed are going to have

17    much, if anything, to do with transition plans that

18    are being proposed.

19          THE COURT: We're talking about symbolism

20    and visibility. I don't know. Maybe Ms. Dym or maybe

21    Mr. Williamson can enlighten the Court as to how often

22    Postal officials appear because Postal officials come

23    on the scene as a regular matter. It's not unusual

24    that they'd be coming on the scene next Tuesday.

25          The fact that they're on the scene shouldn't

1    affect anybody at all.  What might conceivably affect

2    people is what they're talking about.  Well, there's

3    no reason why the work force on the floor needs to

4    know what they're talking about.

5         Then you've sliced this thing even thinner.

6    Now you're talking about what's the impact on the

7    managers of talking about transition.  That's a

8    totally different kind of question.  There are what,

9    four managers?

10        MR. WILLIAMSON:  I'm going to say a half

11   dozen.

12        THE COURT:  Half dozen?

13        MR. WILLIAMSON:  Six or seven or eight, Your

14   Honor.

15        THE COURT:  All right.  Half a dozen

16   managers.

17        MR. GORDON:  Your Honor, I think what you

18   suggested earlier that if the presentation was made

19   that people could choose where they wanted to go and

20   wouldn't lose their job and had options, what

21   difference does it make what the Postal Service is

22   doing?  The same facts are going to occur.

23        The protest will be decided by a specific

24   period of time, and the people will have really the

25   honest assurance that they can actually have

1    regardless of moods and, you know, signs and things

2    like that, but obvious answers.

3            The protest will be decided by April. You

4    have options to do what you want as to where you want

5    to work. You can work here. You can apply anywhere

6    you want to. The decision will be made by the Court

7    at that time, and you now make your decision as an

8    adult. Where do you want to work?

9            THE COURT: Let me ask, Mr. Gordon, this

10   point blank question. Do you have an interest in

11   having the managers work for you?

12           MR. GORDON: From my understanding from my

13   client, we are not dependent on hiring any of the

14   people.

15           THE COURT: I understand that.

16           MR. GORDON: We've agreed. What we've said

17   we'd do is basically entertain their applications. I

18   really think if we didn't get any it wouldn't make a

19   difference.

20           THE COURT: I'm not asking you to make a

21   commitment as to the success of your enterprise

22   turning on this thing. I just want to know whether --

23           MR. GORDON: If any of these people are

24   qualified, my client said they'll interview them and

25   hire them if they're qualified.

1           THE COURT:  Well, it appeared to me that it

2    might be possible to have an agreement between the two

3    entities in which the managers agree to stay on over

4    the course of this transition period and then in

5    return for that, not going anywhere else, as well as

6    not going to APL, New Breed would, if the protest

7    failed, recommend that APL hire Mr. Ferraro and Ms.

8    Mahoney and whomever else it is.

9           For its part, APL would say we would not

10   hire and take away during this interim period any of

11   those managers, but we would entertain very, very

12   sympathetically recommendations by New Breed for

13   hiring.

14         The advantage, it seems to me, to both sides

15   is you have certainty in terms of the transition, and

16   the supreme advantage to the employees is as long as

17   they don't walk out the door to a third party, which

18   is just as bad for New Breed, as long as they don't do

19   that they have as close as you could get to a follow

20   on employment.

21         Now, I don't know why you all couldn't work

22   out some sort of arrangement like that that

23   satisfies --

24         MR. GORDON:  That is not offensive to me as

25   long as we have the option to hire them and evaluate

1    them on their merits. That's what we proposed.

2         THE COURT: Now, I would think that the

3    Postal Service would be much in favor of on the one

4    hand not having New Breed's service deteriorate during

5    the transition period by having stability in the work

6    force over time --

7         MR. WILLIAMSON: Yes, Your Honor.

8         THE COURT: -- and having a start up as

9    smooth as possible with experienced personnel when the

10   hand over actually began to occur.

11        MR. WILLIAMSON: Yes, Your Honor, but I do

12   want to echo Mr. Gordon's comments that the Postal

13   Service did not choose APL presuming that it would be

14   necessary --

15        THE COURT: No. I fully understand.

16        MR. WILLIAMSON: Okay.

17        THE COURT: I fully understand that.

18        MR. WILLIAMSON: Thank you.

19        THE COURT: You know, it's not what turns

20   APL's success on, but there is an advantage to APL

21   presumably in having experience period if they want to

22   come do it. They're not obligated to hire anybody.

23        I don't think they make any concessions of

24   any sort, symbolic or otherwise, by doing this. I

25   don't think New Breed looses anything by this either.

1    We are in fact talking about two months, and we're

2    talking about not having a blunderbuss of an

3    injunction that would probably be not satisfactory to

4    any of the parties. I don't know how one would

5    monitor or police it, but it would have to be policed.

6            I don't know about paragraph 3. Does an

7    advertisement in the Burton Record constitute a

8    violation of No. 3 or a billboard half a mile down the

9    road? I don't want to get into that sort of stuff.

10   I'm not even sure it's --

11           MR. WILLIAMSON: Your Honor, if we do strike

12   an agreement that is not memorialized in an injunction

13   then how do the parties ensure compliance with it?

14           THE COURT: I hate to raise this as

15   relevancy, but how about good faith? I guess what I

16   would do is I would revisit this question if it turned

17   out that you couldn't do it, but I don't think this is

18   very complicated.

19           It's a whole lot easier to submit a bid

20   under this RFP than it is to work out a couple

21   paragraphs with the Postal Service, I think since you

22   have an interest in having this agreement, helping the

23   two sides work out to some certainty.

24           MR. DAVIS: Your Honor, I didn't mean to

25   interrupt if you were --

1          THE COURT:  No.  Go ahead.

2          MR. DAVIS:  May I suggest that you have

3    presented a number of ideas, which I thank you for,

4    that perhaps we have not fully considered in our past

5    discussions.

6          I would suggest or respectfully suggest that

7    perhaps maybe not an adjourning, but a recess be taken

8    of this argument so that we could confer with our

9    client and, you know, the Postal Service and APL with

10   its client.  Perhaps we could talk and report back to

11   the Court maybe even later on this afternoon as to

12   whether we've reached an agreement or not or whether

13   we need to proceed with the argument on the

14   injunction.

15         Certainly New Breed would be willing to do

16   that.  I need to talk with New Breed, Mr. Hunt in

17   particular who's here happily.  His presence will

18   hopefully advance this and get his reaction to some of

19   the ideas you've suggested, Your Honor.

20         THE COURT:  Well, I think that Ms. Mahoney

21   and Mr. Ferraro would certainly be happy to find out

22   that these uncertainties were eliminated.

23         MR. DAVIS:  I understand.

24         THE COURT:  Do you think there's anything

25   here to talk further about, Mr. Williamson and Mr.

1    Gordon?  I gather from Mr. Gordon that answer might be

2    yes, correct?

3          MR. GORDON:  As far as I'm concerned,

4    there's not that much more to talk about for APL's

5    concern.  We're happy to entertain applications.  The

6    people would not be likely hired until after the Court

7    issued its decision, so I don't see what --

8          THE COURT:  Well, that in itself might be

9    the product of a letter exchange.

10         MR. GORDON:  Yes.  That would not be a

11   problem for us.

12         THE COURT:  That's a different kind of

13   solution, but it would be a solution certainly for two

14   months, and I would think that anything that the two

15   parties thought would make their life easier the

16   Postal Service would be in favor of also, but, Mr.

17   Williamson, I shouldn't speak for you.

18         MR. WILLIAMSON:  Thank you, Your Honor.  We

19   would certainly be willing to resume our discussions

20   with Mr. Davis.

21         One of the subjects we haven't addressed is

22   the point concerning discussions reaching the

23   contractors, other contractors who were operating on

24   the site.  New Breed says that they have a concern

25   that those people will agitate their employees and

1    drive away --

2           THE COURT:  Yes, but that disappears if

3    you've worked out an agreement with respect to the

4    existing work force.  Then you don't have to worry

5    about aggravations because the people know that an

6    agreement has been reached between APL and New Breed

7    for continuity of employment irrespective of whichever

8    outcome --

9           MR. WILLIAMSON:  Yes.

10          THE COURT:  -- of the protest, so what the

11   truck drivers say over a beer -- maybe they shouldn't

12   be saying it over a beer, but --

13          MR. WILLIAMSON:  Let's hope not.  Not at the

14   plant.

15          THE COURT:  Over coffee is not going to

16   affect the work force, so I think that goes out the

17   window if the parties can come to an agreement.

18          MR. DAVIS:  If we agreed to some of the

19   other things.

20          THE COURT:  One of the questions is is there

21   enough here to warrant a recess?  I wouldn't do it for

22   the rest of the day because I don't want to press you

23   all.

24          MR. GORDON:  I guess the answer --

25          THE COURT:  Over the next few days, you're

1    either going to come to some agreement or not come to
2    some agreement.

3         MR. GORDON:  It would seem to me that if New
4    Breed gets an assurance that its people will be
5    considered by us, you know, sometime after April when
6    the Court issues its decision, I don't really know why
7    the other cosmic signs of how things are going matter.

8         I mean, I don't see why they can't just sort
9    of withdraw those and let the process just take their
10   course as long as the employees have a sense that
11   they'll be considered fairly by us, as well as by
12   them.

13        THE COURT:  Well, I think what I'm concerned
14   about is a document that memorializes that
15   presentation, but also something that the two parties
16   can show the work force --

17        MR. DAVIS:  I understand.

18        THE COURT:  -- for their sake as well as New
19   Breed's sake.

20        MR. GORDON:  So in that sense I'm sure Mr.
21   Davis needs to talk to his client for a few minutes,
22   and I'm sure Postal has to decide for themselves.
23   They're the government.

24        THE COURT:  Well, what I want to find out,
25   and I think I have from Mr. Gordon, but I want to find

1    out from Mr. Williamson. Do you think there's enough
2    possibility of coming to some sort of an accommodation
3    that it's worth taking a recess to explore it further?
4         MR. WILLIAMSON: I believe so, but I do just
5    want to clarify.
6         Mr. Davis, is it your position that you
7    would be willing to consider APL's proposal, or are
8    you saying yes, we will do that? You want to consult
9    with New Breed.
10        MR. DAVIS: Your Honor, I need to consult
11   with my client on all of these matters. That's not
12   the only idea that's been floated out here. Your
13   Honor had a number of ideas. We've all been listening
14   to them intently, and I think we need to share those
15   ideas respectively on our own sides of the table.
16        THE COURT: I won't offer myself up as a
17   mediator because I don't believe that decisional
18   judges should also be settlement judges. I don't know
19   that this is the kind of thing that needs outside help
20   because I, frankly, don't think that it's that
21   difficult to come to some sort of an accommodation,
22   but if there is a need for it I'll get one of my
23   colleagues to join in.
24        The Court, of course, has its own selfish
25   interests here, and that is I don't want to listen to

1   you all for three hours.  I don't want to have an
2   evidentiary hearing, and I don't want to consider how
3   to frame if I decide to frame an equitable injunction.

4           MR. DAVIS:  We won't take that personally,
5   Your Honor.

6           THE COURT:  It can be inequitable, but this
7   I would hope would be an equitable injunction, so I
8   have an interest also in having you all see if you
9   can't reduce this to a letter or memorandum of
10  understanding or something like that.

11          I think what I would like to do is give a
12  recess and either come back -- Friday is not good.
13  Why don't you advise me between now and Friday of
14  whether or not you can come to an agreement, and in
15  the event you can't come to an agreement I think I
16  would probably look at Monday, 10:00, and we'll get a
17  little more formal.

18          Let me ask Mr. Baker.  Okay?  That seems to
19  be okay.

20          In the interim we're going to have a filing
21  of the administrative record.

22          MR. WILLIAMSON:  Yes, Your Honor, on Friday.

23          THE COURT:  I hope that that would include
24  and I'd like to insure that that includes the existing
25  contract that New Breed has at least insofar as it

1   makes provision or doesn't make provision for

2   transition obligations, the transition plan that Mr.

3   Hunt referred.

4            I'd like to have a schedule of the

5   transition activities that might be encompassed by

6   paragraph 2 and the timing insofar as the Postal

7   Service is concerned or APL is concerned with respect

8   to each of those events.

9            MR. WILLIAMSON:  Yes, Your Honor.

10           THE COURT:  It can be a scrub list.  I mean,

11  if you take a look at it and you decide well, this can

12  happen on April 2, you don't have to include it in the

13  list.  You can scrub the list.

14           MR. WILLIAMSON:  Okay.  Just to clarify,

15  Your Honor, are you asking for an existing transition

16  plan?

17           THE COURT:  Well, the one that Mr. Hunt

18  referred to --

19           MR. WILLIAMSON:  Okay.  Yes.

20           THE COURT:  -- was an existing plan.  I

21  think what I'm looking for now is what kinds of

22  activities does the Postal Service contemplate that

23  would be affected by paragraph 2 or encompassed by

24  paragraph 2.

25           MR. WILLIAMSON:  And I just want to clarify

1    that you're asking for existing documents that address

2    that?

3              THE COURT:  No, no.  If you're prepared to

4    modify that, you can just send a memorandum.

5              MR. WILLIAMSON:  Okay.

6              THE COURT:  These are the eight things we

7    want to do, and these are the dates we need to do it

8    or we wish to do it.  As I say, it's a scrub list so

9    it does include things that you could, if I pressed

10   you, say sure, I'll do that in May.

11             MR. WILLIAMSON:  But this will be part of

12   the administrative record, correct, Your Honor, or

13   this will be a separate submission?

14             THE COURT:  Or a supplement to it or

15   whatever it is.  I see it as necessary for the

16   injunction if it comes to that, but I don't know that

17   it becomes necessary for the merits.

18             MR. DAVIS:  Your Honor, I would see that as

19   necessary for purposes of the discussions we're going

20   to be having over the next couple of days.

21             THE COURT:  Okay.  That's why I would assume

22   that you all will be talking about it together --

23             MR. DAVIS:  Yes.

24             THE COURT:  -- to see what kinds of

25   arrangements might be necessary or not.  It might be

1   obviated by another approach.

2         In any event, if we have to come back to a

3   consideration, a formal consideration of an

4   injunction, I want to see exactly what it is that's

5   covered by paragraph 2.

6         MR. WILLIAMSON:  All right.  And Your Honor

7   would like that submitted Friday because we're coming

8   back Monday in the event --

9         THE COURT:  In the event, yes.  I think you

10  have to give me a little bit of time to look at it.

11        MR. WILLIAMSON:  I understand.

12        THE COURT:  If it's Friday close of

13  business, there's not a lot of time between Monday at

14  10:00.

15        MR. WILLIAMSON:  No.  Friday.

16        THE COURT:  Fax it over the weekend, okay?

17        MR. WILLIAMSON:  Okay.  Well, I'm not

18  presuming that we necessarily will need to do that,

19  Your Honor.

20        THE COURT:  No.  I expect Mr. Baker will not

21  have to sit by the fax machine all day Sunday.  He'd

22  appreciate that, too.

23        Is there anything else we need to talk

24  about?

25        MR. GORDON:  Your Honor, I think we have a

1     little concern.  Probably I'm speaking out of turn,

2     but just from comments I've heard offhand on the

3     Protective Order and filing of redacted copies with

4     the Court.

5          Is there any way that we could file the

6     redacted copies say, for example, the day after the

7     actual briefs are filed, something like that?

8          THE COURT:  You're talking about future

9     filings?

10         MR. GORDON:  Yes.

11         MR. WILLIAMSON:  Yes, sir.

12         THE COURT:  That is a problem, and I think

13    that it says contemporaneous with.

14         MR. WILLIAMSON:  It is, Your Honor.

15         THE COURT:  I think that was intended to

16    give you a little bit of flexibility.

17         MR. WILLIAMSON:  Yes, Your Honor.

18         THE COURT:  You know, this process should

19    not take very long, and there shouldn't be anything

20    else so if you do it the day before.  You know, you

21    finish your brief the day before and send it over in

22    time for the other side to get it back.

23         MR. GORDON:  What lawyers finish their

24    briefs the day before?

25         THE COURT:  I understand.  I've had this in

1   almost every case in which a Protective Order has been
2   filed as to where to do it.  If you want to add a day,
3   we'll informally add a day to every time, to every due
4   date.  Rather than take a day off your schedule, we'll
5   add a day for an exchange of documents.

6           MR. WILLIAMSON:  Your Honor, effectively
7   that's what we did.  That's what the government did
8   when it filed its brief Monday night was then the
9   first thing Tuesday morning I called Mr. Davis and Mr.
10  Gordon and said do you have any problems with our
11  redactions.  They made an initial review and did not
12  have, but I think --

13          THE COURT:  I suspect there's not going to
14  be any difficulty.  All will recognize it.

15          I should add I guess with respect to the
16  administrative record that that we'll seal just
17  because it gets to be too difficult to redact and
18  highlight different portions, so we don't have to
19  worry about the administrative record itself at least
20  in the initial instance.

21          Let me ask just for my knowledge.  The award
22  memorandum is something the government would like to
23  keep confidential.  Is that correct?

24          MR. WILLIAMSON:  Your Honor, I would have to
25  discuss that with the Postal Service.

1        THE COURT:  Okay.

2        MR. WILLIAMSON:  I think our principal

3    concern is APL and New Breed, you know, the different

4    bidders.

5        THE COURT:  The actual proposals.  Am I

6    correct that the D.C. Circuit's rule is that the

7    proposal of the winning bidder is not covered by

8    Freedom of Information Act?

9        MR. GORDON:  But there's proprietary data,

10    and there's the Trade Secrets Act that protects the

11    winning bidder's proposal for technical or --

12        THE COURT:  Some portions of it.

13        MR. GORDON:  And particularly in this case

14    where the other side is asking essentially to reopen

15    things and potentially who knows what.  I think

16    typically these kinds of things just aren't disclosed.

17        THE COURT:  Well, I'm not talking about

18    interim disposal.  I'm talking about end of the case.

19        MR. GORDON:  And decision?

20        THE COURT:  Yes.  Well, that and appeal.

21    Right.

22        MR. GORDON:  One of the problems I think

23    from my client's point of view, and I'm sure from

24    theirs, is we compete with each other on a lot of

25    things, and a lot of similar things are probably in

1    each others' proposals that are not shared by the
2    others.

3         THE COURT:  I suspected that was the case.
4    I've had other experiences where that has become
5    important.  Okay.  I didn't mean to start a whole new
6    subject.

7         I want to thank you all very much for your
8    receptiveness to this, and I hope to hear
9    affirmatively from you within the next few days.

10        MR. DAVIS:  Thank you, Your Honor.

11        THE COURT:  I hope I don't see you on
12   monday.

13        MR. WILLIAMSON:  Thank you, Your Honor.

14        THE COURT:  Thank you all very much.  We're
15   adjourned.

16        (Whereupon, at 2:53 p.m the hearing in the
17   above-entitled matter was concluded.)

18   //
19   //
20   //
21   //
22   //
23   //
24   //
25   //

1                    REPORTER'S CERTIFICATE

2

3    DOCKET NO.:    03-115C

4    CASE TITLE:    New Breed Leasing Corp. v. U.S.

5    HEARING DATE:  January 29, 2003

6    LOCATION:      Washington, D.C.

7

8         I hereby certify that the proceedings and

9    evidence are contained fully and accurately on the

10   tapes and notes reported by me at the hearing in the

11   above case before the United States Court of Federal

12   Claims.

13

14                        Date:   January 29, 2003

15

16                        Charity Davis

17

18                        Official Reporter

19                        Heritage Reporting Corporation

20                        Suite 600

21                        1220 L Street, N.W.

22                        Washington, D.C.   20005-4018

23

24

25