# UNITED STATES
# COURT OF FEDERAL CLAIMS

FILED
APR 1 2003
U.S. COURT OF FEDERAL CLAIMS

NEW BREED LEASING CORPORATION,
Plaintiff,

v. Docket No.: 03-115C

UNITED STATES,
Defendant.

Pages: 1 through 30

Place: Washington, D.C.

Date: March 31, 2003

## HERITAGE REPORTING CORPORATION

*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

93



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NEW BREED LEASING CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | Docket No.: 03-115C |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday,
March 31, 2003

The parties met, pursuant to notice of the Court, at 1:35 p.m.

BEFORE: HONORABLE LAWRENCE M. BASKIR
Judge

APPEARANCES:

For the Plaintiff:

PHILIP J. DAVIS, Esquire
DAN GRAHAM, Esquire
TIM STALEY, Esquire
PHILLIP H. HARRINGTON, Esquire
Wiley, Rein & Fielding
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

APPEARANCES:     (cont'd.)

For the Defendant:

JOHN H. WILLIAMSON, Esquire
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.  20530
(202) 307-0277

Also for the Defendant:

LAURIE DYM, Esquire
Commercial & Appellate Litigation
U.S. Postal Service


For the Intervenor, APL Logistics:

MICHAEL A. GORDON, Esquire
Holmes, Schwartz & Gordon
17 West Jefferson Street, Suite 202
Rockville, Maryland  20854
(301) 340-1251

P R O C E E D I N G S

(1:35 p.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Judge Lawrence M. Baskir presiding.

New Breed Leasing Corporation v. The United States, Case No. 03-115C, comes before the Court today on the parties' cross motions for summary judgment.

THE COURT: Good afternoon. Please be seated.

ALL: Good afternoon, Your Honor.

THE COURT: I think I need to ask you all, please, to identify yourselves, although I think I recognize a few faces.

MR. DAVIS: Your Honor, on behalf of Plaintiff, New Breed Leasing Corporation, I am Philip Davis with the firm of Wiley, Rein & Fielding. To my left is Dan Graham of our firm, to his left is Tim Staley of our firm, and to his left is Phil Harrington of our firm, Your Honor.

MR. WILLIAMSON: Your Honor, John Williamson from the U.S. Department of Justice on behalf of Defendant, United States of America. To my right is Ms. Laurie Dym. She is counsel, Commercial & Appellate Litigation, for the United States Postal

Service.

MR. GORDON: I am Mike Gordon representing APL Logistics, the Intervenor.

THE COURT: Okay. I want to thank you again for the very fine written and oral advocacy that you all have put into this case. It is very, very helpful, and it is always a pleasure to read and to hear good advocacy like that, so thank you all very, very much for that.

ALL: Thank you, Your Honor.

THE COURT: I believe when we started our scheduling a couple months back again we had targeted April 1 as the date by which a decision should be made in this case. You all came to an arrangement for the interim, and, having heard no complaints, I gather it has worked out pretty well, and I am pleased that you could come up with that.

I want to keep my own part of the bargain and render a decision today in the case. It is a fact driven case, and so I'm not sure there's anything in here of lasting import in the formation of bid protest law that would require an extended written opinion taking an extended amount of time.

That having been said, let me start with the end. I am going to grant the government's motion for

summary judgment and deny the Plaintiff's. I don't believe Plaintiff has made the case for this bid protest, and I'll go into that in a little more detail.

First as I guess some initial matters, let me say that I believe that the award date is January 3, as the Plaintiff and as the Intervenor have contended, as opposed to the government. It is quite clear that as of January 3 the competition was over, APL was selected, other offerors were not selected, and that concluded that process.

It was possible, of course, and I guess it is always possible, that the awardee may fail to follow through on its contract obligations, but that's a different matter, and that's not a bid protest matter. The consequence of that, of course, is that some of the issues that New Breed raised as, for example, the question of the facility lease, become not the subject of a bid protest, but of a contract administration question between the government or the Postal Service, I guess, and APL and not involving other offerors.

On a second matter that has to do with an argument that New Breed appeared to be making during the course of oral argument, and that had to do with

the adequacy of documentation of the analysis and the review of the various proposals, I think, first of all, it's too late to raise that issue as an independent issue if indeed that was New Breed's contention at oral argument. It was not in the papers and should have been if it was to be raised.

Secondly, I'm not sure that the record actually supports such a charge. It seems to me that there are notations and reflections of discussions on a whole range of issues and various forms, e-mails and others, which pretty well document many of the issues we've talked about, if not all of those issues, so on that ground I think it would fail.

I also think it would fail because I'm not sure that procurement law requires a level of specificity of documentation down to the kinds of technical matters and precise matters that we were talking about when this was discussed last week. I think I address this in the Cubic decision, and I think it would come out the same way in this case.

That has to do, I guess, with the overall questions. Let me now start with what or continue with what I would have thought in the past was the last issue, and that is prejudice, but now I think under the Court of Appeals rules it's the first issue.

It was not contested by the government. I don't think there is any question that were a procurement violation to be found here, New Breed would be prejudiced.

The high quality of New Breed's proposal and the narrowness of the price distinction between the two offerors makes it clear that New Breed would have standing or would have been prejudiced or would satisfy the prejudice standard, so I say that I guess as an initial matter. As I say, I would have thought it would have been the last matter.

Now let me get to the particulars of New Breed's case. There were three areas of non-compliance that New Breed raised. I'm going to deal with them each in turn. The first one has to do with a letter of intent for the facility. I do not understand the RFP's requirement to be as strict as New Breed presented, and that is to say that it presents a legal document evidencing control over the prospective facility.

I think the letter of intent serves a different kind of purpose. As I read it, it required an offeror to identify a particular location with enough specificity so that that was not something which would then have to be undertaken from scratch

 after the award.

I think that that letter of intent had to have some basic kinds of information about what a prospective lease might be, and it had to be endorsed by the potential lessor and the offeror. I think APL satisfied the essentials of that letter of intent, so I don't believe that any omissions like the expiration date went to the core of what the letter of intent was supposed to serve, and I certainly don't think it needed to be a legally binding document.

There was no real presentation in the papers that explained the letter of intent in those terms, and I don't understand the letter of intent to be exactly that. There couldn't be a legally binding agreement between an offeror like APL and a landlord like Sony, for example, when APL never knew it was going to actually have to have that facility or not, so I think it was just a preliminary kind of document with preliminary assurances.

Certainly it was sufficient so that the Postal Service could visit the facility, examine it and satisfy itself that it was sufficient for the various departments that facility had to have, and there was, of course, a site visit and some things, especially parking, which we'll get into in a moment.

Some things were gone into in great detail by that site visit, so I think the letter of intent satisfied the purposes of the RFP.

Let me move on to the parking. The parking proposal that APL presented was sufficient so that the various consulting experts that the Postal Service had employed could review APL's plan, could review them against the site location itself, together with an unfortunate ball park, and satisfy itself that indeed the requirements of the RFP with respect to trailer parking could be satisfied with this particular location.

I think that the plans that APL submitted plus the discussions apparently were sufficient for this purpose. I didn't understand the 1988 site plan to be the absolute norm against which all offerors or any offeror would be measured, and I note that there were some issues raised with respect to APL being able to satisfy the site plan, but apparently they were resolved to satisfaction.

Some issues were raised with respect to New Breed itself and its ability under that. I have no doubt that New Breed could have satisfied it. I don't remember seeing any indication in the record that New Breed had failed the trailer parking in any degree

greater than the questions that were raised with respect to APL, so I think that the trailer parking was satisfied.

Now, there was a problem with respect to the APL site not as to whether or not it could comply, but whether or not it could comply in a timely manner considering the fact that the seven month time period between the original award date and the start date of May 24 had been reduced to five months. That was recognized, that was discussed, and APL came up with a contingency plan for a temporary parking facility to the extent that the ultimate one couldn't be done in time.

I don't see any reason why -- let me start again. That would seem perfectly satisfactory to everybody. It was not a foregone conclusion, and I guess it still is not a foregone conclusion, that APL could not meet the parking requirements by May 24, but it had a provision in the event that there was a period of time that it could not meet it.

I don't think that that contingency plan was at all defective. I don't think a letter of intent was necessary. That's not what I understood the off-site letter of intent to require, and so I find that that was perfectly satisfactory.

I guess the third area had to do with APL's implementation plan. Besides the trailer parking question, which was identified and resolved to the satisfaction, I think properly, of the Postal Service, there was some questions raised I guess about machinery delivery dates. As I understand the record, APL satisfied that by assuring the Postal Service that it had contacted suppliers, that they all could supply the required items in time and that the largest lead time for any kind of machinery was 12 months or 12 weeks rather, and that's certainly well within the time period.

I was not persuaded that there were any issues with respect to the implementation plan at the submission date that raised any issues that would have foreclosed APL from have satisfied the requirements to submit a proper implementation plan. Those are I think what I would term the three non-compliance issues that were raised here.

Let me get now to I guess the comprehensive charge of a failure to consider risk. That took I think a number of forms, but I think it was clearly satisfied by the Postal Service. When the original proposals were submitted, deficiencies were noted with respect to a variety of items in APL and in other

offerors' proposals. Those were discussed with APL. They were resolved to the satisfaction.

The parking was a deficiency or potential deficiency. That was addressed. The timeliness of the parking, the trailer parking, was raised. That was addressed. The potential problem of getting machinery deliveries was identified as a problem, and that was addressed, and a variety of other things were addressed in terms of risk or, if you will, deficiency, and they were addressed either to the satisfaction of the Postal Service or at least minimized.

A potential deficiency with respect to the sorting scheme that APL proposed was nominated as a deficiency or potential deficiency. That was discussed, and apparently that was also resolved, so I don't think it is accurate to say that risk was not identified. Risk was certainly identified, certainly addressed.

That is not to say that APL's plan doesn't have some inherent risk in the translation of a proposal to an actual operation, but that's I think inherent in any proposal, certainly any proposal of a challenger, as opposed to an incumbent, so I don't think that the issue of risk was established,

certainly not to my satisfaction.

Now, there was I think a question raised with respect to the lease cost and whether or not that was underestimated on the part of APL. APL had assigned a cost of approximately $21 million or $22 million over the course of this contract for lease expenses, and there is a question as to whether or not that figure more properly should have been $26 million.

That has to do with the amount of space and proper amount of lease costs that would be chargeable to the Postal Service and was also framed by New Breed as a potential performance risk. That certainly I don't think would be that. The fact that a potential cost or even an actual expense if you were to look at the actual lease itself might be different from an estimate shouldn't surprise anybody. I would really think that if anything you can be confident about it is that estimated costs never turned out to be what the actual expense is. That's just the very nature of estimates.

For a $4 million discrepancy, if indeed it is a discrepancy, allocated over a $100 million contract and nine years just does not, in my mind, raise even the possibility that it would risk APL not

being able to complete this contract satisfactorily, which was I think the core of what New Breed's point was, so I don't consider that to be a risk at all or -- well, no. I won't even say a de minimis risk. I don't believe that that kind of discrepancy, if there is a discrepancy, amounts to any kind of a possibility of a performance risk.

Let me get next to the question of the tradeoff. I don't understand the language in the RFP with respect to tradeoff to involve what I understand New Breed's point was, and that was an explicit comparison of the proposal. I understand that language to be a requirement that were the selection to go to a higher priced offeror there had to be a tradeoff with respect to quality. That is to say the Postal Service had to be buying, if that's the proper term; had to be buying higher quality with that extra or higher cost, so that's what I understand the quality of the cost technical merit provision to mean.

If it means, as New Breed suggests, an explicit tradeoff between the proposals -- that is to say a comparison between the proposals -- and I don't, as I say, understand the terms to be that, but if that's what it means I think the award recommendation clearly does that in its discussion of the two

proposals independently to be sure and in its overview of the potential suppliers. It does indeed compare the cost of the two proposals and the respective benefits that are found in the two proposals, so I think that the cost tradeoff, no matter how you read it, was certainly met by the Postal Service in its award recommendation.

Let me get to the final matter, and that has to do with transportation cost saving or, if you want to make it a little bit more general, the cost savings to the Postal Service of going with incumbency in New Breed's incumbency. This issue I think was raised and decided when the Postal Service, as it properly could, decided to increase the radius from the bulk mail center from 25 miles to 40 miles. By doing that, I think they inherently increased the chances that challengers could have a viable, competing offeror, and I guess to that extent that decision was disadvantageous to New Breed.

At that time, New Breed did propose that the transportation costs, the arguably higher transportation costs of being able to site the service center 40 miles away from the bulk mail center, that those arguably higher transportation costs which the Postal Service had to bear should be factored in in

the selection process.

New Breed proposed that. The Postal Service decided not to do that. To do that, assuming it could be done, would clearly benefit New Breed because of the proximity of its center to the bulk center or its facility to the bulk mail center, and so the Postal Service declined to do that.

If that was an issue or should have been an issue in New Breed's eyes, it should have objected to that failure to make it an explicit factor in the selection process at that time. It did not, and I think it waived the right to complain about it thereafter.

If one, however, takes that issue on its merit I think that it is a very questionable merit indeed. The transportation costs are a factor not only of the distance from the bulk mail center, but also distance from various customers that would be the source of the mail transport equipment that's going to the service center.

To the extent that you were to locate the service center further away from let's say some suppliers or some sources of the equipment, you would necessarily be making it closer to others, and it would be totally speculative and I think more than

speculatively indeterminant as to whether or not the location within this 40 mile radius ultimately ended up costing more or less in terms of transportation costs.

That's even viewing the sources as a static universe of sources, but over the course of nine years, it seems to me, it would change from year to year, and you couldn't in any legitimate way calculate what the transportation cost consequences would be locating the service center, locating this service center, anywhere within that 40 mile radius of the bulk mail center.

I think that answers. The New Breed study itself was deficient in any number of ways, but I think inevitably no study could be adequate enough to provide a reliable benchmark of savings that would be applied to measure the cost or the work to the Postal Service of any of these offerors, so I do not take the transportation study and its last-minute surfacing again as being a legitimate issue.

That I think covers the major points of New Breed's case and the responses. Let me now turn I guess to a wrap up, and that has to do with the Protective Order. I notice that once again the gallery is not filled with people who are curious to

find the secrets that New Breed and the Postal Service and APL have invented in this case, so I don't think that's a difficulty.

I also don't think that my oral recitation of the reasons raises or makes explicit any of the protected materials that you all have cited, so let me ask first, Mr. Williamson, whether this transcript of today's proceedings you think has any protected material in it in my comments?

MR. WILLIAMSON: No, Your Honor, not so far as the government is concerned.

THE COURT: Mr. Gordon?

MR. GORDON: That's not my impression from listening to it.

THE COURT: Mr. Davis?

MR. DAVIS: I would agree with that, Your Honor. I didn't detect any protected information.

THE COURT: All right. So we will not seal today's proceeding.

I want to ask now. Maybe you've had a chance to consider Thursday's oral argument, so let me ask the same kind of questions with Mr. Williamson. It may be a little bit more difficult to answer. Did you identify in retrospect or at the time any protected information raised by any of us?

MR. WILLIAMSON: Well, I guess two questions, Your Honor.

As far as the government is concerned, I think our position all along has been that the government doesn't see any proprietary information in any of the submissions that have been made, but whether the government's position with respect to what New Breed or APL may wish to be protected, I don't think we would object if the commercial entities do want to designate certain parts.

THE COURT: I understand. In other words, so far as the Postal Service and the government is concerned, there's no information pertinent to the government that you would from your own position want to protect?

MR. WILLIAMSON: That's correct, Your Honor.

THE COURT: Okay. Mr. Gordon, I wonder if you had an opportunity to review?

MR. GORDON: I thought about Thursday a lot, but I thought about everything that was said for operational purposes. I think probably the parts that we're most sensitive about would be the operational aspects of the proposal.

I think those operational aspects will come up again in future procurements. My understanding is

probably New Breed is doing what it does operationally very similarly to what they do in New Jersey, and we would be proposing something operationally that's different, as you can tell --

THE COURT: Yes.

MR. GORDON: -- from the record, than what they do, and that should not be public knowledge.

THE COURT: Well, do you think that the discussion, and you're talking now about the sorting which --

MR. GORDON: Yes. I think some of the discussion might have gone into those areas because I think Mr. Davis I think tried to express his view of what our sortation method represented versus what theirs represented.

THE COURT: Although I guess his description of what you were doing wouldn't necessarily --

MR. GORDON: Well, I think --

THE COURT: Let me put it this way.

MR. GORDON: -- our competitors are going to find out from the others.

THE COURT: Okay.

MR. GORDON: I think it would not be difficult to excise those portions of the record that would cover proprietary information.

THE COURT: All right. Let me speak I guess more generically because the parties denoted information that they considered or wished to have protected. I have not reviewed them, so I don't consider your nominated pieces of information to be information that will in fact be protected. That's yet to come.

Let me just take Thursday's transcript and put it with the other material that you submitted under seal and talk about that. I have to say that none of the items that I read which has to do with the written submissions, and I'm only talking about the written submissions of the parties with respect to the motion.

None of that had any highlighted information, and I don't know whether that is an oversight or reflects the fact that there wasn't anything sensitive in those submissions, but I think that I'm wrong about that because I did take a glance at at least APL's redacted version, and there was an awful lot of black in it so I guess what I read didn't reflect highlighted editions.

I think what I want to ask you all to do is to, and I'm sorry to do this again, but I think I'd like to have you submit a considered edition of your

papers, having discussed it between the parties as to the other parties' sensitive information, and submit to me the kinds of information or submit to me another edition with it highlighted.

I really would like along with it a memorandum, and nothing necessarily elaborate, identifying the reasons why a particular kind of information needs to be protected. I think, Mr. Gordon, for example, with respect to the sorting you consider that to be an operational trade secret, and I think that's all you have to designate with respect to that, so any time I see any description of sorting I will understand it and evaluate it on that basis.

If it has to do with bid price and you believe that that bid price is protected information, I think I would recognize that kind of information. The legal status of the bid price and its components is a little uncertain in my mind because I think that the winning bidder's ultimate price is not protected.

Whether an unsuccessful bidder's price is not protected is I think a separate question, so the fact that we know what the interim price was and final price was, that I think is a different kind of question. If you wanted to take that, I think I'd like a little explanation. It doesn't necessarily

have to be more than a paragraph, --

MR. DAVIS: Thank you, Your Honor.

THE COURT: -- you know, establishing why that is the case so we have the prices.

I don't know whether the technical raw numbers of 995 and 930 tells anybody anything, so I don't think I would include that as a category of protected information.

While I don't think it is necessary or worthwhile to go through every page and every item in the administrative record, if you can designate, if you will, by volume those portions of the administrative record that don't contain any kind of protected information then at least we could do that, but I don't think a page and paragraph review of the administrative record is worth anybody's time.

MR. WILLIAMSON: Your Honor, the government is at a bit of a loss, I think, to take a considered view of what APL or New Breed might designate to be --

THE COURT: I understand, but they'll let you know.

MR. WILLIAMSON: All right.

THE COURT: And you will circulate these things amongst all of you before you send it in. If anybody objects to somebody else's designation, you

obviously can reflect that, too. They'll let you know what they consider --

MR. WILLIAMSON: Okay. At the risk of being accused of trying to dodge work, I just wanted --

THE COURT: Well, the government has nothing of its own information --

MR. WILLIAMSON: That's correct.

THE COURT: -- it wants to protect, so it will only be derivative of the other parties.

MR. WILLIAMSON: Yes.

THE COURT: They'll let you know, and if you want to take issue with something --

MR. WILLIAMSON: Okay.

THE COURT: -- you certainly may take issue with what another party wants to keep confidential, as any party may.

MR. WILLIAMSON: Okay. So they'll let us know about the government's brief what should be?

THE COURT: Yes.

MR. WILLIAMSON: All right. Okay. That's fine.

THE COURT: I would like to know from the award recommendation, which I think is a critical piece of information. I would like to have that as unedited as possible, but obviously do review that.

As I say, you can conveniently segregate portions of the administrative record as protected and not protected without a line by line review. That's certainly fine, too.

I will issue within a day or two a written confirmation of this ruling, but this is the ruling of the Court. Knowing that we're talking about prices and specifics of prices as one category of protected information and the sorting question as another, there's nothing in what I propose to issue in written form that I think would transgress the parties' desire to keep the information confidential.

Is there anything else that I ought to be alert to?

MR. GORDON: I was thinking about the lease pricing. I'll have to talk to my client about some of these things obviously.

THE COURT: Yes.

MR. GORDON: There are a lot of things that people claim protection to in their proposals that is not ordinarily disclosed by a bidder.

THE COURT: Yes. I would think that if it came to that it would only be the $4 million proposed discrepancy rather than the underlying base numbers.

MR. GORDON: I'll have to think about that.

THE COURT: Okay.

MR. GORDON: I understand what you're saying, but any range of information is competitive information to competitors that they might not otherwise have access to, and I just want to run it by my client to see if --

THE COURT: Okay. Well, Richie has a pretty good idea since they got the same kind of estimate, didn't they?

MR. GORDON: But they don't know what we had. I mean, competitors are not --

THE COURT: I understand. If it turns out indeed to be different, I'm not sure that a $4 million ball park --

MR. GORDON: Right.

THE COURT: -- is going to tell them anything.

MR. GORDON: Right, but New Breed doesn't know, for example, and there are other competitors that don't know.

THE COURT: All right. Anyway, let me know whether the $4 million margin is something. I need to let Mr. Baker know informally if you intend to claim it.

MR. GORDON: Okay. I'll let you know. I'll


call them today.

THE COURT: Okay.

MR. HARRINGTON: Your Honor?

THE COURT: Yes?

MR. HARRINGTON: May I ask one clarification?

THE COURT: Certainly.

MR. HARRINGTON: The administrative record does include the technical proposals and the cost proposals. Were you thinking of releasing those?

THE COURT: No. No. That's what I would expect to have as the core of the trade secret and other kinds of information, so that's not what I would expect to be on the public side.

It may not be possible to review the administrative record and make a simple dichotomy between the two versions, or it may be so little that would be made public that it would not help anybody at all.

MR. WILLIAMSON: The proposals are for the most part sort of in the same location in the record, I think.

THE COURT: Right. Right. The analysis, however, would then --

MR. WILLIAMSON: Yes.

THE COURT: -- be elsewhere. It may be that there's nothing conveniently that could be made public.

I've had bid protest cases in which it just was totally impractical to edit the administrative record. I don't believe in terms of the public a lot more is required to understand the nature of this case and the Court's ruling and its place in the spectrum of bid protest beyond the parties' submission and the Court ruling in the oral argument.

Okay. Is there anything else we need to address, Mr. Davis?

MR. DAVIS: No, Your Honor, but since you've given me the opportunity I just wanted to thank the Court for its thorough consideration of the issues as evidenced by the oral argument that we had last week and your ruling. I appreciate your consideration of these matters.

THE COURT: Yes, sir.

MR. GORDON: We feel the same way.

MR. WILLIAMSON: Ditto, Your Honor.

THE COURT: Okay. Well, thank you very much.

All right. Do I see Mr. Williamson again soon with another one?

MR. WILLIAMSON: Yes, Your Honor. You'll be getting our opening brief tomorrow.

THE COURT: All right. I will say parenthetically that one of my colleagues came up, having seen the calendar for today and having seen New Breed and the law firm on it, wondering what was going on because she also has a New Breed, which I think your firm represents.

MR. DAVIS: That is correct, Your Honor.

THE COURT: I assured her it was not the same case.

MR. DAVIS: That's right.

THE COURT: I assume it's not the same case?

MR. DAVIS: No, it's not.

THE COURT: Very good. Mr. Baker, anything else?

MR. BAKER: No.

THE COURT: Okay. Thank you again, everybody. We are adjourned.

ALL: Thank you, Your Honor.

(Whereupon, at 2:12 p.m. the hearing in the above-entitled matter was concluded.)

//

//

//

REPORTER'S CERTIFICATE

DOCKET NO.: 03-115C
CASE TITLE: New Breed Leasing v. U.S.
HEARING DATE: March 31, 2003
LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: March 31, 2003

Mason Edwards
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018